DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Diane Derrickson, appeals from a judgment of the Wayne County Court of Common Pleas, which found her guilty of felony theft and sentenced her accordingly. We affirm.
 I. {¶ 2} Ms. Derrickson was the bookkeeper for Horizontal Equipment Manufacturing, Inc., near Wooster, Ohio, from mid 2000 until early 2003. Other than Ms. Derrickson, only the owner, Leo Barbera, had access to company checks or the financial records, but Mr. Barbera resides in North Carolina and was seldom present. In 2003, because the company was losing money despite its high volume of sales, Mr. Barbera asked his former bookkeeper, Jennifer Myers, to review the books, identify the source of the problem, and help him return the company to profitability. Ms. Myers began her review on January 29, 2003.
 {¶ 3} On February 18, 2003, Ms. Myers reprinted the financial records from the office computer and, upon comparison with the printout from January 29, 2003, discovered that certain records had been altered during the intervening time. Specifically, the recorded payees' names for certain checks had been changed, but upon Ms. Myers' inquiry, Ms. Derrickson could not produce the actual cancelled checks. Ms. Myers became suspicious and obtained, from the company's bank, copies of all cancelled checks dating back to the time she left in 2000.
 {¶ 4} Ms. Myers discovered 38 checks that had been misidentified in the company's financial records as having been paid to one party, but which had been made payable to a different party. Ms. Myers suspected Ms. Derrickson of stealing from the company by preparing checks for herself and disguising her theft by misrepresenting the payee of the checks in the records. Generally, these checks were paid to "cash" or to Ms. Derrickson's personal credit cards (or those of her husband) while the record entries represented that the checks had been paid to certain company vendors, despite the absence of any corresponding invoices.[1]
 {¶ 5} Ms. Myers reported her suspicions to Mr. Barbera, who fired Ms. Derrickson and filed criminal charges. Ms. Derrickson was indicted for theft in violation of R.C. 2913.02, and tampering with records in violation of R.C. 2913.42. Ms. Derrickson pled not guilty and the case proceeded to trial. A jury acquitted Ms. Derrickson on the tampering charge, but convicted her of theft, a fifth degree felony. The court entered judgment and sentenced her accordingly. Ms. Derrickson timely appealed, asserting two assignments of error for review.
 II. A. First Assignment of Error
"The trial court violated defendant-appellant's confrontation clause rights and committed reversible error in admitting hearsay statements which implicated appellant, when these statements did not contain adequate indicia of reliability."
 {¶ 6} Ms. Derrickson states that the court improperly admitted hearsay evidence against her, in violation of her Sixth Amendment right to confront witnesses. Specifically, Ms. Derrickson protests that the spreadsheet prepared by Ms. Myers, which identified and summarized the 38 misidentified checks and which was admitted into evidence, also contained notations by Ms. Myers of vendors' statements that they had not sought payment nor been paid as reported by Ms. Derrickson. Ms. Derrickson protests that the inability to cross-examine the vendors resulted in prejudice that warrants reversal. We disagree.
 {¶ 7} Ms. Derrickson alleges that admission of these hearsay statements was a violation of her constitutional right to confront witnesses, pursuant to Crawford v. Washington (2004), 541 U.S. 36,158 L.Ed.2d 177. While we doubt the validity of this allegation underCrawford's prerequisites for witness unavailability and testimonial statements, see id. at 59 fn.9 and 68, we find that the purported error is harmless in either event. See Crim.R. 52(A); State v. Cutlip, 9th Dist. No. 03CA0118-M, 2004-Ohio-2120, at ¶ 17. Thus, on harmless error analysis, we "inquire `whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Id., quoting State v. Madrigal (2000), 87 Ohio St.3d 378, 388, citing Chapmanv. California (1967), 386 U.S. 18, 23, 17 L.Ed.2d 705.
 {¶ 8} Ms. Derrickson's claim of prejudice appears to rest on her story that she paid these vendors in cash (as they would only accept cash) for goods or services rendered, and therefore she did not steal the money but was merely recovering the cash outlay generated from her personal resources. We begin by noting that this theory strains the imagination. It is unlikely that some 15 to 20 otherwise fully functioning businesses would not send invoices and would accept only cash payment; not company checks, not company credit cards, not certified checks or money orders, and every time for sums of less than $1,000. It is unlikely that these same companies would provide neither invoices nor receipts for these exclusively cash transactions. It is unlikely that a bookkeeper without any ownership interest in the company would willingly, routinely and repeatedly generate this cash, totaling between $15,000 and $20,000, by way of cash advances on her personal credit cards and personal indorsement of company checks made payable to "cash." And, it is unlikely that Mr. Barbera, as owner of the business, would condone such a lax method of payment and bookkeeping. However, we recognize that the plausibility of Ms. Derrickson's theory (and its effect on the jury) is largely immaterial; the burden of proof at trial was on the State, and we look for evidence beyond the spreadsheet that her allegations are untrue and these vendors were not paid.
 {¶ 9} The State offered testimonial and documentary evidence that the company paid Ms. Derrickson (i.e., paid her credit cards directly or that she indorsed the checks made payable to "cash"), that there were no invoices from the vendors, that there were no receipts from the vendors to either the company or Ms. Derrickson personally, and that she never told Mr. Barbera or anyone else at the company that she was generating cash in this manner. We find the jury may draw reasonable inferences from this evidence, and could have reasonably concluded that Ms. Derrickson did not pass this cash along to any vendors. See State v. Sanders (Feb. 13, 1998), 6th Dist. No. L-96-379, at *7. However, we need not stop there.
 {¶ 10} During the State's direct examination of Ms. Myers, the following exchange occurred without objection:

 "[State:] How do you know that none of the money went
 to the vendors that are listed there?
 "[Ms. Myers:] Because I called them all.
 "[State:] No one had any record of any payments in those
 amounts?
 "[Ms. Myers:] No. Most of those vendors we have accounts
 with."

Therefore, this information was already before the jury and available for their consideration. Thus, Ms. Derrickson's contention that she was prejudiced by the presence of this same information on the spreadsheet is without merit. Ms. Derrickson's first assignment of error is overruled.
 B. Second Assignment of Error
"The trial court [erred] in finding the defendant-appellant guilty of violating R.C. 2913.02 when such a finding was against the manifest weight of the evidence."
 {¶ 11} Ms. Derrickson asserts that the State did not adequately prove that she knowingly stole any money, nor did the State accurately prove the amount. Rather, she claims that due to the company's poor credit with its vendors, those vendors would only accept cash, and therefore she innocently, though perhaps ignorantly, wrote checks for cash and fronted her personal money to obtain cash for the continued operation of the company, and was merely reimbursed by way of these checks. Thus, Ms. Derrickson charges that the verdict was against the manifest weight of the evidence and should be reversed. We disagree.
 {¶ 12} Reversal on manifest weight grounds is reserved for the exceptional case where the evidence demonstrates that the "trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." State v. Otten (1986),33 Ohio App.3d 339, 340. Accord State v. Thompkins (1997),78 Ohio St.3d 380, 387. A conviction may be upheld even when the evidence is susceptible to some possible, plausible, or even reasonable theory of innocence. See State v. Jenks (1991), 61 Ohio St.3d 259, 272. Similarly, on conflicting testimony, "a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *5.
 {¶ 13} We pause to note that the State did not file an appellate brief, and therefore, to a certain extent, we may accept Ms. Derrickson's statements of the facts and issues as correct. See App.R. 18(C). However, Ms. Derrickson has challenged her jury conviction on the basis that it is against the manifest weight of the evidence, and under our standard of review for such a challenge an appellate court reviews the entire record and weighs the evidence, considering all reasonable inferences in favor of the jury verdict. Otten, 33 Ohio App.3d at 340. Thus, we must consider Ms. Derrickson's argument and assertions on appeal in light of the evidence actually adduced at trial, as recorded in the trial transcript.
 {¶ 14} Under R.C. 2913.02(A)(2), theft is enforced as: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent[.]" In particular, Ms. Derrickson contends that the State did not prove a culpable mental state, nor did it prove the amount of money (property) stolen. We disagree.
 {¶ 15} At trial, the jury heard testimony from five witnesses. The State produced Mr. Barbera, Ms. Myers and a police investigator. Ms. Derrickson produced one witness and testified herself. Upon acknowledging that such testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound principal that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence. SeeState v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 16} The State demonstrated that Ms. Derrickson was preparing checks for payment to herself, her husband, her personal credit cards or cash, which she had been neither authorized nor expected to do. She had recorded these checks as having been paid to various vendors, yet there were no invoices or receipts. As stated in our analysis above, the jury could reasonably have inferred from this evidence that Ms. Derrickson did not pass this cash along to any vendors, but rather intended to and did take and keep this money for herself. See Sanders at *7.
 {¶ 17} Ms. Derrickson's witness, a former coworker, attempted to support her position, but on cross-examination quickly admitted that he had been terminated by Mr. Barbera and remained bitter. Furthermore, he agreed that he would not have used his own money, as Ms. Derrickson claims to have done, and volunteered that under those circumstances, he would have used the company credit cards. Thus, he was not particularly helpful to Ms. Derrickson's defense.
 {¶ 18} Ms. Derrickson testified in her own defense, which was founded on her explanation that she had no financial or accounting background prior to beginning this bookkeeping position, that she received insufficient training and oversight, and that the company was so poorly run that she was personally forced to extreme measures to accommodate this ineptitude. Ms. Derrickson explained that prior to applying for and obtaining this job, her only prior experience was as a homemaker and later as a custodian at a hospital. Moreover, Mr. Barbera was seldom present, as he resides in North Carolina, leaving her with responsibilities beyond that of an ordinary bookkeeper. Significant among these responsibilities was obtaining payment for the various vendors so that the company might continue to operate. Beyond her claim that she had merely fronted the money in order to pay the vendors in cash, she also testified specifically that the vendors would not send invoices and that they would not accept anything but cash.
 {¶ 19} While these claims were generally uncontested, they are not so persuasive as to support a finding that the jury "clearly lost its way." See Otten, 33 Ohio App.3d at 340. For example, one does not need a financial or accounting degree to recognize the implications of paying thousands of dollars to oneself in cash, while recording in the company books that it had been paid to vendors, concurrently secreting this information from the owner, and failing to document this procedure by way of receipts or invoices. Furthermore, Mr. Barbera's absence would seemingly prompt a reasonable person to insist on receipts for these cash payments, even if only to ensure her own reimbursement rather than for the company's records, assuming that a reasonable person would expend thousands of dollars of her own money in support of the business. Finally, Ms. Derrickson's account does not explain Ms. Myers' uncontested testimony that these vendors never sought or received these purported cash payments and that the company did in fact have credit accounts with many of the vendors listed by Ms. Derrickson.
 {¶ 20} In her continuing testimony, Ms. Derrickson also alleged that the company files had mysteriously been broken into the night before Ms. Myers began her investigation. Ms. Derrickson testified that on January 29, 2003, the day Ms. Myers began her investigation, she saw Ms. Myers tear copies of cancelled checks from the files and throw them into the garbage. Ms. Derrickson testified that Ms. Myers was the one who made changes to the records, that other employees used the company credit cards for personal use, and that Mr. Barbera voluntarily and altruistically paid her credit card bills. Finally, she claimed that Ms. Myers lost or destroyed the receipts for all of these payments. Most if not all of these claims were rebutted by the State on cross-examination or via witness testimony.
 {¶ 21} Based on our review, we conclude that Ms. Derrickson's criticisms of the State's evidence in this case are insufficient to find that the jury lost its way and created a manifest miscarriage of justice. See Otten, 33 Ohio App.3d at 340; Thompkins,78 Ohio St.3d at 387. Rather, we find it reasonable that the jury believed the State's version of the events, and convicted Ms. Derrickson accordingly. We conclude that the conviction is not against the manifest weight of the evidence. Ms. Derrickson's second assignment of error is overruled.
 III. {¶ 22} Ms. Derrickson's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Whitmore, P.J. Moore, J. Concur.
[1] At trial, the State admitted into evidence a summary spreadsheet prepared by Ms. Myers, which identified 38 of these misidentified checks, and also admitted copies of the actual cancelled checks for each. The authenticity of the records and checks was stipulated. Eleven of the 38 checks, totaling $7,725, were paid directly to the Derricksons' personal credit card accounts, while the company financial records represented that they had been paid to certain vendors. There were no corresponding invoices from these vendors in the company records, nor were there any receipts for payment. The State also admitted copies of Ms. Derrickson's credit card statements, demonstrating that the company checks had indeed been paid to and received by the stated credit card companies. Ms. Derrickson's personal credit card accounts were with Capital One and American Express, and every one of the "purchases" on these credit card reports was a cash advance. Perhaps coincidentally, the company's credit card accounts were also with Capital One and American Express; accounts for which Ms. Derrickson (and previously, Ms. Myers) would routinely pay by preparing checks for Mr. Barbera's signature.
Four of the 38 checks, totaling $1,814, were paid directly to Ms. Derrickson's husband, Richard Derrickson, as a vendor to the company, although there were no corresponding invoices in the company records, nor any receipts for payment. Similarly, three checks, totaling $815, were paid to one Beth Carter, as a vendor to the company, although there were no corresponding invoices or receipts in the company records. One check for $375 was actually made payable to Ms. Derrickson's own name (and indorsed by her), although the records reflect that it was paid to "Kick Farms," again without any corresponding invoice from this vendor or any written receipt, made out to either the company or Ms. Derrickson.
Finally, the other 19 checks, totaling $6,033, were each made payable to "cash," but as with the others, the company records reflected that they had been paid to specific vendors, but without any corresponding invoice or receipt from any of these vendors.